[No. 645-3. Division Three. July 27, 1973.]

ELDON H. WEBBER et al., Appellants, v. FRANKLIN POTATO GROWERS, INC., Respondent.

C. J. Rabideau (of Moore & Rabideau), for appellants.

Charles T. Schillberg and William J. Plonske, for respondent.

Munson, J.—Plaintiffs instituted an action for damages, contending that pursuant to a potato marketing agreement entered into with defendant they were entitled to a greater sum per ton for potatoes delivered than they in fact received. Plaintiffs appeal from an order granting defendant's motion for summary judgment.

In February, 1968, plaintiffs entered into a potato marketing agreement with the defendant agricultural cooperative association. Pursuant to that agreement, plaintiffs delivered their 1968 potato crop. It is undisputed that plaintiffs' potatoes were of low quality, having been damaged by a condition known as "leek." These potatoes were placed in a pool with similar potatoes, which were unsuitable for the fresh market, and sold accordingly. Plaintiffs were paid in relation to the price at which potatoes in this pool were sold. Top quality potatoes were placed in another pool called a "russet" pool, and subsequently sold at a substantially higher price. Growers who had supplied these potatoes were paid according to the higher price.

Plaintiffs urge that pursuant to the marketing agreement and representations made by agents of the defendant, the monies received from sales of all potatoes delivered to defendant, regardless of quality, should have been placed in one pool and all growers paid the same price, *i.e.,* the russet pool price.

The trial court disagreed with plaintiffs' contentions and, in granting defendant's motion for summary judgment, stated there were no evidentiary facts presented in opposition to that motion which would affect the legal interpretation of the marketing agreement. The court then interpreted the marketing agreement as authorizing the defendant to set up separate pools, depending upon the quality of the potatoes delivered, and to pay each grower his pro rata share of the proceeds from the sale of the pool in which his potatoes had been placed. The plaintiffs received a lower price than some other growers because all of their potatoes involved herein were properly placed within the pool made up of lower quality potatoes.

The sole question is whether a genuine issue of material fact has been presented by the plaintiffs in opposition to the defendant's motion for summary judgment. CR 56(c). The alleged statements by defendant's agents indicating there would be only one pool were made, in point of time, after the plaintiffs entered into the potato marketing agreement in February, 1968.

We agree with the trial court that whether such statements were actually made does not affect the legal interpretation of the contract. We also agree that the marketing contract here at issue, when read together with statutory authorization for such contracts and cooperative articles of incorporation and bylaws included by reference in the contract, clearly gave defendant the discretionary power to market plaintiffs' crop and to compute payment in the manner it employed.

RCW 24.32 sets forth the statutory authorization for agricultural cooperative associations. RCW 24.32.210 authorizes such an association and its members to:

> make and execute marketing contracts, requiring the members to sell, for any period of time, all or any specified part of their agricultural products or specified commodities exclusively to or through the association or any facilities to be created by the association.

The statute further provides that such a contract:

> may provide that the association may sell or resell the products of its members, with or without taking title thereto; *and pay over on a proportional basis* or otherwise to its members the resale price, after deducting all necessary selling, overhead and other costs and expenses,
> . . .

(Italics ours.)

The marketing agreement entered into between the parties required, "the undersigned grower . . . to deliver to the Association . . . all the potatoes he produces . . ." and incorporated by reference the articles and bylaws of the association.

Paragraph B of the marketing agreement, captioned "MARKETING," states:

The grower shall deliver his potatoes promptly to the Association in such manner as the Association may specify. *The Association may grade and/or classify potatoes as to kind, quality, state of preparation for marketing or other basis and may mingle them with similarly classified or graded potatoes delivered to it by other growers.* All such potatoes may be treated as if they were the absolute property of the Association. It is hereby authorized to handle, transport, store, process, sell, borrow money upon, and exercise every other right of ownership upon said potatoes. The Association will use its best endeavors to sell all said potatoes at the best price obtainable in its judgement. *The time, manner, terms and conditions of delivery, grading, classification and sale shall be such as the Association may deem fair and advantageous* to the group of growers marketing potatoes through it.

(Italics ours.) Paragraph D of the marketing agreement, captioned "DISTRIBUTION OF PROCEEDS," states in part:

The Association *shall receive the proceeds derived from the sale of all potatoes in each pool.* . . . The grower shall receive in full payment for his potatoes *a pro rata share of the net proceeds of sale.*

(Italics ours.) Paragraph E thereof, captioned "COOPERATIVE POLICIES," states in part:

It is the intention of the Association in the conduct of marketing, allocation of costs, and distribution of proceeds, and in the doing of all other things herein authorized to *pay each grower all the net returns from the sale of his potatoes upon a fair patronage basis.* Its exercise of all authority and discretion herein conferred . . . shall be final so long as the same are made in good faith.

(Italics ours.)

The amended articles of incorporation of the defendant further define the broad powers accorded to defendant in article 4, section 2(e): "The Association *may,* at will, *comingle, pool, grade and standardize* any and all products handled by it." (Italics ours.)

The foregoing quotations show that plaintiffs, in entering

into this agreement, granted the association, operating through its officers, the sole right to determine the manner of marketing plaintiffs' potato crop.[1] The association through its officers chose to form pools and to distribute the net proceeds, pro rata, from the sale of each pool to the member growers who contributed to that pool.[2] This method of operation was clearly authorized by the marketing contract.

An agent of the defendant, its president or its board of directors, at one time, may have contemplated selling the various qualities of potatoes and putting the entire proceeds into one pool and then distributing the net proceeds therefrom to members of the defendant co-op on the basis of tonnage delivered. However, the facts show that this method of distribution was not used. The method of pooling and selling potatoes pursuant to the marketing contract was to be determined solely by the board of directors of the defendant, and it is obvious that they chose a different procedure than what plaintiffs thought most desirable.

[1]The language of the agreement in *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 343 P.2d 183 (1959) was even more explicit.

[2]Two types of marketing agreements are described in *Elliott v. Adeckes*, 240 Minn. 113, 119, 59 N.W.2d 894 (1953):

It appears from the cases, however, that the first, or so-called pooling co-operative, operates under a marketing agreement whereby it provides a marketing service for the products produced by its members by pooling their products and selling them at a time when the management of the cooperative association deems it advantageous to do so, depending on the condition of the market. Generally under this plan the pool is sold collectively. After deducting the expenses of the entire pool operation, the proceeds are distributed among the various producers in proportion to their respective contribution of products to the pool. . . . The second type . . . is the co-operative association which is set up for the purpose of purchasing the commodities, such as milk or cream, produced by its members or patrons, taking title thereto, and paying for them at the market price current at the time of delivery.

The type of agreement in this case is described above as the "so-called pooling cooperative."

Plaintiffs were bound by the marketing contract and by the determinations made by the officers of defendant.

Judgment is affirmed.

GREEN, C.J., and McINTURFF, J., concur.